UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

vs.

CHARLES A. SLAYDEN, JR.

Case No. 19-CR-10189-DJC

## GOVERNMENT'S SENTENCING MEMORANDUM

Charles Slayden is convicted of conspiracy to unlawfully engage in the business of dealing in firearms without a license. The evidence described in the PSR demonstrates that he was involved in a conspiracy to straw purchase and re-sell at least eight firearms on the streets in Boston, and completed all essential steps of the conspiracy to "buy low and sell high" these firearms. Moreover, while on release in this matter, given the opportunity to demonstrate that the firearm dealing was an unrepresentative lapse in judgment, instead he engaged in further dangerous behavior with serious effects.

Accordingly, notwithstanding other sympathetic qualities of the defendant, the Government now must recommend a 30-month sentence of imprisonment – at the high end of the Guidelines Sentencing Range (GSR) as calculated by the government and defendant – as well as supervised release for three years thereafter. The government further recommends that conditions of supervised release include geographic and associational restrictions aimed at preventing the defendant from falling prey to the forces that led him into criminal conduct in this case.

## **FACTS**[1]

As of April 2019, Charles Slayden, also known as "CJ," was an identified member of the Creston Street gang, and was listed as an "active member" of the Creston Street gang in the Boston Regional Intelligence Center's gang database.   PSR ¶ 45.

In November 2018, Slayden asked his longtime friend Levenson Merilus to purchase a gun for Slayden to keep at his home.   Specifically, the suggested arrangement was that Slayden would provide the money to purchase it and would keep it at his home, but it would "technically" be owned by Merilus and Merilus could use it whenever he wanted.   Merilus purchased the firearm as requested on November 23, 2018, and transported it to Slayden's house.   Slayden later informed Merilus that he had sold the firearm.   PSR ¶¶ 37-43.

By no later than February 19, 2019, Slayden willfully entered into an agreement with Merilus to purchase firearms from a federal firearms licensee and then re-sell them for a profit to individuals in Boston.   Neither Slayden nor Merilus was a licensed importer, licensed manufacturer, or licensed dealer of firearms as defined in 18 U.S.C. § 921, and Slayden knew that neither of them was so licensed.   PSR ¶ 8.

As part of this conspiracy, Slayden took orders, and collected payment, for firearms from others.   On four separate occasions in February and March 2019, Slayden traveled with Merilus – who at that time had a valid MA License to Carry Firearms – to the federally licensed firearms dealer to purchase the firearms.   Slayden directed Merilus which firearms to purchase and provided him with the funds to purchase them.   Merilus purchased the firearms, and disguised the true nature of the transaction by certifying on a Bureau of Alcohol, Tobacco, Firearms, and

---

[1]  Because none of the material facts are disputed, the government does not believe that an evidentiary sentencing hearing is necessary.

Explosives Form 4473, Firearms Transaction Record, that he was the actual transferee/buyer of the firearms listed on the subject form, when, in fact, he was not.    PSR ¶ 9.

After the purchase of the firearms from the federally licensed firearms dealer, Slayden paid Merilus a portion of the profit from the anticipated re-sale of the firearms.    Merilus transported the firearms in his car to locations in Boston as directed by Slayden, and provided them to Slayden, for Slayden to distribute to the actual buyers in Boston.    PSR ¶ 9.

In furtherance of the conspiracy, and to avoid detection, Slayden attempted to obliterate the serial number on at least one of the firearms.    On March 9, 2019, one of the dates that Slayden and Merilus straw purchased firearms, a keyword search for "obliterated" was conducted on Slayden's phone.    The next day, Slayden sent Merilus a text message that said "Best ones yet," and attached two photographs of what appeared to be firearm serial numbers which had been obliterated.    PSR ¶ 29.    Accordingly, these firearms could not be traced back to him and Merilus.

After their final attempted purchase of firearms on March 16 was delayed in completion, Merilus returned to the FFL for the purpose of obtaining a refund.    He obtained and cashed the refund check, and then attempted to send the money to Slayden via the "Cash App" mobile phone application.    When the payment would not go through, Slayden directed him to send the money to a different account, and Merilus did so.    In text messages surrounding this sequence of events, to impress on Merilus the urgency of returning the money, Slayden forwarded to Merilus threats that Slayden had purportedly received from a prospective purchaser, to the effect that Slayden had better deliver the purchaser's "order" (the firearm) or return his "bread" (money advanced for that purpose), or else.    PSR ¶ 36.

On March 20, 2019, Slayden suggested to Merilus that they purchase another firearm "for us."  PSR ¶ 44.   Because of the federal investigation, that purchase never happened.   However, a red gun trigger lock was found in Slayden's apartment when a federal search warrant was executed there, indicative that a firearm had once been stored there.   PSR ¶ 45.

On April 12, SLAYDEN was arrested, and his phone was seized.   It was later searched pursuant to a search warrant, and agents discovered the following among other evidence on the phone:

- A photo dated February 8, 2019, depicting SLAYDEN holding a Glock firearm[2] up pointed slightly to the left of the camera.   (*See* Exhibit 1.)

- A photo dated February 8, 2019, depicting a "Creston Boy" necklace and wad of cash. (*See* Exhibit 2.)

- A photo depicting Slayden wearing a "Creston Boy" hat.   (*See* Exhibit 3.)

- A photo dated February 23, 2019 – one of the dates that Slayden and Merilus purchased firearms – depicting the bottom half of someone sitting in the passenger seat of a car, with three guns on their lap.   (*See* Exhibit 4.)

- A keyword search from March 19, 2019: "gun stores near me."

- Keyword searches from March 20, 2019: "if someone got caught with my firearm what happens" and "can you buy high capacity firearms in MA"?

PSR ¶ 46.   The firearms purchased and re-sold by Slayden and Merilus have not been recovered; or, if they have, they were not able to be traced.

In all, together Slayden and Merilus purchased or attempted to purchase at least 11 firearms.[3]

---

[2]  This is not one of the 11 firearms purchased by Slayden and Merilus between November 2018 and March 2019.
[3]  This includes one firearm successfully purchased in November 2018 for joint use, which Slayden ultimately re-sold; eight firearms successfully purchased between February and March 2019, all but one of which were re-sold (the last was retained by Merilus and ultimately seized by ATF); and two firearms purchased in March but then cancelled (such that the defendants never took possession) after a delay in delivery.

**DISCUSSION**

I.    **Sentencing Guideline Calculation**

While the U.S. Sentencing Guidelines ("USSG") are advisory and not mandatory, *United States v. Booker,* 543 U.S. 220 (2005), the First Circuit has made clear that "the guidelines still play an important role in the sentencing procedure, so that [ ] a court should ordinarily begin by calculating the applicable guideline range." *United States v. Gilman*, 478 F.3d 440, 445 (1st Cir. 2007).

Based on its computation of Slayden's base offense level as 14 based on its view that he was a prohibited person at the time of the offense, adding 4 levels because the offense involved 8 or more firearms and 4 levels because the offense involved at least one firearm with an obliterated serial number, and providing a three-level reduction for prompt acceptance of responsibility, U.S. Probation has calculated a total offense level of 19.   Calculating his criminal history category as I, U.S. Probation has calculated the GSR in this case to include a term of incarceration from 30 to 37 months, to be followed by a term of supervised release of one to three years; a fine of $10,000 to $100,000; and a special assessment of $100.

The government disputes this calculation.   As the government notes in its Objections to the PSR, other than the uncorroborated statement by the defendant that he was an active marijuana user at the time of the prohibited offense (PSR ¶ 89), the government is not aware of any independent evidence that Mr. Slayden was a habitual marijuana user such that he was a prohibited person at the time of the offense, and thus does not believe that it could meet its burden of proving this fact at a sentencing hearing.   The government acknowledges *U.S. v. Caparotta*, 676 F.3d 213 (1st Cir. 2012), cited by Probation for the proposition that a defendant's statements about drug use can be relied upon by Probation in drafting a Presentence Report, and by the Court in imposing a

sentence.   However, in *Caparotta,* unlike here, the government also was aware of additional evidence of the defendant's drug use, including drug-related text messages three days before and three days after the offense.   The government notes that *Caparotta* states that the District Court has "broad discretion to determine whether the information [from a pretrial interview is] appropriate to consider at sentencing."   *Id.* at 219.   Here, for the reasons stated in the parties' Objections to the PSR, the District Court should decline to consider the defendant's statements in the pretrial interview.   Accordingly, the government urges the Court to find that the proper base offense level is 12, the total offense level is properly calculated as 17, and the GSR is properly calculated as 24-30 months.

## II.    Application of the Section 3553(a) Factors

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2).   These factors include the nature and circumstances of the offenses and the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide for the needs of the defendant.   They also require courts to consider the kinds of sentences available, and the GSR.   In this case, these factors point to a sentence of imprisonment of 30 months, and to three years of supervised release including associational and geographic restrictions.

### A.  Nature and Circumstances of the Offense; Need for Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment and Deterrence, and Protect the Public

The nature of the offense is exceptionally serious.   This was a conspiracy to unlawfully

deal in firearms without a license.   It was not a one-time lapse in judgment.   It continued over the course of two months, and over four separate purchase dates.   Because the object of the conspiracy was substantially completed, multiple firearms have been illegally distributed on the streets of Boston by Slayden, most likely to individuals who are unable to lawfully procure firearms.[4]   They have not been recovered, or, if they have, due to the obliterated serial numbers, they have not been traced.

The scourge of gun violence in Boston is well-documented.   Between January 1 and November 22, 2020, Boston has recorded 43 fatal shootings and 216 non-fatal shootings. *See* https://static1.squarespace.com/static/5086f19ce4b0ad16ff15598d/t/5fbc227ebfc43f74b78432e4/1606165118284/Weekly+Crime+Overview_+11-22-20+4.pdf (last accessed Nov. 25, 2020). Any sentence in a case such as this must take into account the harms that the proliferation of illegal firearms causes to the community, and the danger that these particular untraceable firearms pose to the community right now.   A 30-month sentence – though the high end of the Guidelines as calculated by the parties – is the lowest sentence that adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment and deterrence.

In analyzing the "nature and circumstances of the offense" in this case, and the need for just punishment, the Court should also consider Slayden's role in the offense.   The scheme was his idea.   He had the connections to the prospective purchasers and took their "orders" for what to purchase.   He collected their money and provided it to Merilus.   He was physically present for

---

[4] While there is not sufficient evidence of who the firearms were sold to or proof that the *defendant* had reason to believe that his conduct would result in transfer of a firearm to an individual whose possession would be unlawful or who intended to use it unlawfully, and thus no basis to apply USSG § 2K2.1(b)(5), the fact that the defendants were purchasing firearms for half the cost that they re-sold them for on the streets suggests to the *government* that the individuals purchasing the firearms were themselves unable to purchase them lawfully at the FFL.   In light of these circumstances, among other reasons, the guideline calculation does not overstate the seriousness of the offense, and the variance requested by the defendant is unwarranted.

each of these purchases.   He delivered the guns.   He understood the dangerousness of the offense, and the dangerousness of the people that he was arming, yet did it anyway; this is evident in the text messages that he sent to Merilus allegedly "passing on" a threat from a prospective purchaser if they did not return his money or deliver the firearm he had ordered.

### B. The History and Characteristics of the Defendant

The government acknowledges certain points that the defense has highlighted in this case, and that are reflected in the PSR.   Slayden is a young man, who has earned a high school diploma, and has engaged in volunteer youth basketball coaching.   He wrote an eloquent, introspective letter to the Court.   He certainly has the potential to be a law-abiding member of society, after taking responsibility for his offenses, which he has begun to do by pleading guilty.   The government's recommendation takes these attributes into account.

However, the government's recommendation must also consider other, less favorable personal characteristics.   At the time of the incident, Slayden was documented as being an active member of the Creston Street gang in Boston.   There are photos on his phone of him wearing gang-related paraphernalia and him holding guns.   Both he and his brother have been shot on Creston Street.[5]   These circumstances give pause regarding his procuring and distributing these firearms, beyond the fact that he did not have a license to carry, possess, or sell them, and demonstrate the seriousness of this offense.

Moreover, while on release in this matter, given the opportunity to demonstrate that the conduct here stemmed from an unrepresentative lapse in judgment, instead he engaged in further

---

[5] While being a victim of gun violence is not necessarily indicative of gang involvement, where Slayden was shot on Creston Street leaving a memorial service for a friend who had been killed (Defendant's Letter, Dkt. No. 120-2), there is at least some reason to believe the shooting was gang-related.

dangerous behavior with serious effects.    While on release, on March 7, 2020, Slayden was

charged with OUI and leaving the scene of a motor vehicle accident involving personal injury.

PSR ¶ 68.    In that incident, according to the police report (Ex. 5), a car that Slayden was driving

crashed into a car a woman was driving, causing her to crash into a light post; she was found sitting

on the asphalt by her open driver's side door, suffering from neck and back pain, and was

transported to the hospital.    After crashing into the car driven by the woman, the car driven by

Slayden drove away.    When he was later pulled over, his passenger was injured and bleeding.    At

booking, Slayden was found to have a BAC of .11%, above the legal limit in Massachusetts.    This

event led to the revocation of his release and an order of detention in this case.    To be clear, the

government does not suggest that this court sentence the defendant on the basis of conduct for

which he has not been convicted, but rather presents these details to round out the defendant's brief

reference to an OUI while on release (Defense Memorandum, Dkt. No. 68, at 8), and to

demonstrate that being charged with a serious federal felony did not cause the defendant to

seriously re-dedicate himself to a law-abiding life.

Altogether, the positive history and characteristics of the defendant described in the

defendant's Sentencing Memorandum, balanced against the other history and characteristics set

forth herein, do not justify a sentence outside the GSR – let alone the significant variance to 12

months and a day requested by the defendant (representing essentially a 50% variance from the

low-end of the guidelines for individuals, like the defendant, with no criminal history).[6]

---

[6] The defendant also cites the COVID-19 pandemic as a reason to vary from a Guidelines sentence in this case. The government recognizes that COVID-19 is a source of significant anxiety to people both inside and outside institutional settings.    However, the defendant does not cite any particular health concerns that put him at increased risk of harm from a COVID-19 infection.    Judges in this District have observed that COVID-19 does not obviate the court from giving proper weight to "the interests of society in the deterrence and punishment functions of the criminal justice system."    *United States v. Pridgen*, 19-10375-RGS, Dkt. No. 73 at 5 (Stearns, J.).

Rather, a sentence of 30 months imprisonment, with three years of supervised release, is sufficient, but not greater than necessary, to accomplish the goals of sentencing set forth in § 3553(a).   Even after serving a 30-month sentence, for which he is expected to receive credit for over 10 months already served, Slayden will still be a very young man with a lot of potential, which the structure of supervised release will help him to achieve.

### C. Conditions of Supervised Release: Reasonable Associational and Geographic Restrictions Are Appropriate In This Case

The government requests the following conditions of supervised release: (1) a restriction from associating with his co-defendant Levenson Merilus (set forth in Attachment A); and (2) a geographic restriction from entering the exclusion zone delineated in Attachment B – the Grove Hall area, including Creston Street, in which he has been involved in numerous police-involved incidents – without the express permission of his Probation Officer.

Appellate courts have routinely upheld such restrictions as a condition of probation or supervised release whenever the restriction served as a deterrent to protect the victimized community or rehabilitate the defendant based on his prior record.   *See United States v. Garrasteguy*, 559 F.3d 34 (1st Cir. 2009) (affirming on plain error review 12-year restriction from Suffolk County imposed on defendant who sold drugs at Bromley Heath Housing Development); *United States v. Watson*, 582 F.3d 974 (9th Cir. 2009) (validating restriction that prevented the defendant from entering City of San Francisco without the prior approval of his Probation Officer); *United States v. Cothran*, 855 F.2d 749 (11th Cir. 1988) (validating a probation restriction that prevented a defendant, convicted of cocaine distribution to minors, from traveling to Fulton County, Georgia, because his return to a high-crime neighborhood in Atlanta would likely result

in his continued criminal activity and the endangerment of neighborhood youth).[7]

Here, the purpose of both the associational and geographic restrictions is to aid Slayden's rehabilitation by reducing his opportunities for further crime, and by eliminating any expectation from other Creston Street gang members and from his co-defendant that he will further engage with them in criminal activities. Here, geographic and associational restrictions will help the defendant to separate himself from the people and places that have contributed to his poor decision-making.

The associational restriction, forbidding Slayden from having contact with his co-defendant, speaks for itself, and is a continuation of one of the conditions of his pretrial release.

As for the geographic restriction, it is well-documented that the Grove Hall area and Creston Street in particular have been problematic for Slayden. See Exhibit 6 (Boston Police Department historical incident reports involving Slayden) at 3 (incident in which defendant was shot on Creston Street), 6 (incident in which another individual in the defendant's vicinity on Creston Street was arrested for unlawful possession of a firearm), 7 (incident in which defendant was threatened by another individual on Creston Street), 8 (incident in which an individual hanging out with defendant on Creston Street was arrested and found with crack cocaine). Indeed, in his own letter to the Court, Slayden refers to Grove Hall as "arguably the heart of violence in the city

---

7 In approving the geographic restriction imposed in *Garrasteguy*, the First Circuit described the legal framework for such conditions as follows:

> District courts have significant flexibility to impose special conditions of supervised release. A district court may impose as a condition of supervised release most discretionary conditions identified in 18 U.S.C. § 3563(b), or any other condition the court deems appropriate. All such conditions, however, must be "reasonably related" to the factors set forth in § 3553(a), may involve "no greater deprivation of liberty than reasonably necessary" to achieve the purposes of §§ 3553(a)(2)(c), (a)(2)(D), and must be consistent with any pertinent policy statement of the United States Sentencing Commission. 18 U.S.C. § 3583(d); *see also United States v. York*, 357 F.3d 14, 20 (1st Cir. 2004).

559 F.3d at 41 (footnotes omitted).

of Boston," states that his high school in that area was "gang infested," and recalls his best friend being murdered on Creston Street, the same street where he was shot after a friend's memorial service.   Dkt. No. 120-2.   His brother Cedrick was also shot in an incident at or around 34 Creston Street in September 2019.   Slayden's father's letter (Dkt. No. 120-1) also makes clear that Creston Street has not been a positive influence on his children.   Accordingly, removing Slayden from that area is a reasonable restriction.

The government recognizes that the defendant's family lives on Creston Street, so it does not make this recommendation lightly.   The government also recognizes that Project Right is within the proposed Exclusion Zone.   Nonetheless, there are many places where Slayden can visit with his family outside of Creston Street, and if permission is sought for a visit on Creston Street for special celebrations like birthdays or holidays, he may seek permission from Probation for such visits.   If he finds an appropriate volunteer opportunity within the Exclusion Zone, and Probation is satisfied that his return to that area will be a net positive rather than negative in his life and for the community, Probation can grant permission for such visits as well, and/or he can seek a modification from the Court.   However, absent a particular showing of a benefit to his returning to that area, Slayden should be required to stay away from it during his period of supervised release.

The government also believes that the RESTART program could benefit Slayden's reentry and provide some of the same benefits he was hoping to obtain through RISE, and suggests that the Court recommend participation in that program.

## CONCLUSION

The Court has before it two starkly different portraits of Charles Slayden.   One is of a young man with great potential, who dreamed of college and was only waylaid by lack of financial

resources, injury, and depression, who feels shame for what he has done.   The other is of a young man who willingly engaged in a dangerous criminal lifestyle, glorified that lifestyle, and made exceptionally dangerous choices that have endangered and continue to endanger the community. Neither of these portraits is the "true Charles Slayden"; both of them together are the true Charles Slayden.   Both portraits capture aspects of Charles Slayden and must be considered in determining his sentence.   But the defendant is not the only person to consider in determining a sentence.   The community must be considered as well.   In this particular case, the exceptionally dangerousness nature of the offense, and the scale of it, involving the purchase or attempted purchase of at least ten firearms, at least seven of which were sold onto the streets of Boston, requires a substantial sentence to adequately punish and deter and promote respect for the law.

A sentence of 30 months incarceration, along with 3 years of supervised release including geographic and associational restrictions, is necessary in this case to reflect the seriousness of the offense of conviction, to promote respect for the law, to adequately punish Slayden for his criminal conduct, to deter him and others from offending in the same way again, and to protect the public. This sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing.

For the foregoing reasons, and those to be articulated at the sentencing hearing, the government respectfully recommends that this Court impose this sentence.

Respectfully submitted,

UNITED STATES OF AMERICA,

By its attorney,

ANDREW E. LELLING
United States Attorney

*/s/ Elianna J. Nuzum*
Elianna J. Nuzum
Assistant United States Attorney
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
elianna.nuzum@usdoj.gov
617.748.3251

Dated: November 27, 2020

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Elianna J. Nuzum*
Elianna J. Nuzum
Assistant United States Attorney

Dated: November 27, 2020

## <u>ATTACHMENT A</u>

### ASSOCIATIONAL RESTRICTION

### U.S. v. Charles Slayden, 19-CR-10189-DJC

During the period of supervised release, the defendant is prohibited from contacting, or being in the company of his co-defendant Levenson Merilus, without the prior approval of the U.S. Probation office.

## ATTACHMENT B

## GEOGRAPHIC RESTRICTION

### U.S. v. Charles Slayden, 19-CR-10189-DJC

During the period of supervised release, the defendant will be precluded from entering the Grove Hall area on the map set out below, bounded by Blue Hill Avenue, Quincy Street, Columbia Road, and Geneva Avenue within the city of Boston ("the Exclusion Zone") without the express permission of the U.S. Probation Office.   This restriction does not preclude the defendant from traveling by motor vehicle on any of the roads bordering the Exclusion Zone. This geographic restriction is subject to modification by the Court upon motion from either party.

